Case of Estate of Rexroad, Arnold O. Sr. v. Mid-West Truckers Risk Management Association, 5-170-342, are counsel ready? Yes, sir. Make your seat. Good afternoon, Justices. May I please have the floor, counsel? My name is Jim Kelly. I'm here representing the appellant, the intervener, in a workers' compensation lien that we hold. In the words of Justice O'Brien from the First District, this appeal involves the humble issue of a statutory workers' compensation lien. And the court in this case, in our opinion, ruled in a way that would be first impression in the State of Illinois and against all Illinois law, the statutes, and prior precedent. In thinking about this case, I thought about when I was first a young lawyer in a big defense firm and a partner sent me out to take the deposition of a plaintiff in a case where we were the lien holder. And I struggled for the week trying to figure out, am I attacking the plaintiff to try to knock her damages down? Am I trying to bolster her credibility to help us get a bigger lien back? We could be sued for third-party liability. Am I supposed to try to show how we train our people and refute any allegations that she did anything wrong? On and on and on and on I struggled. And over the past 25 years, I've been doing the same thing on every case. You have to deal with those issues. And the point is twofold. Number one, we don't have to have any allegiance at all to the employee in any case. We have to protect our client, the lien holder. And it's ever-changing. I've changed my position after deposition. I've changed my position in the middle of mediation before where I want to go one way, waive the lien. So that's the first point from that little anecdote. And the second one is that I want to be respectable or respectful to the judge that made this ruling. And that is that we have a judge that was in probate court who walked into this case handling for another judge who was on the bench in a trial and basically said, you know, I don't know what's going on here. Do you want to come back? Have the other judge do it? Kind of fill me in. And said multiple times this is a very confusing matter. And if you can see from his questioning, I think he thought he was reconsidering a prior order. I think he might have thought he was only dealing with $20,000. And I don't think that he really understood at all what the primary issue is. And that is that we have a statutory right lien that is absolute by statute. And there's no way for the court under this circumstance to knock this lien down in any way to zero. That's black letter law in the state of Illinois. And so certainly for this court not for that judge to not only not fully appreciate the issue, but to then be in a situation where he was making new law. And as Justice O'Brien, you know, said in the Fremont case that the concept of even making the argument that this should be knocked down to zero is a specious argument. And I think that was the battle that we were up against in the lower court. So here we are today. And just briefly, our employee was killed on the side of the road when he was with a tow truck driver trying to get his truck fixed. And a personal injury suit was filed in Indiana involving wrongful death and a survival action, which is important because counsel cites some cases that deal with certain types of actions where the 5B lien doesn't attach. In this particular case, we have a statutorily created 5B lien that attaches to a survival action and a worker's compensation or a wrongful death claim. So in black leather law, we have a lien. We don't have to provide notice, but the court has to protect our interest. Explain what happened with this $100,000 settlement. Counsel, explain the chronology and how that was distributed. Correct. The first part of the case with one of the defendants was settled for $100,000. And the employer, with its lien, was entitled to get 75% of that minus a pro rata share of costs. That was done, and that was distributed. The plaintiff took his 25% fee. We subtracted the pro rata share of costs relative to our recovery, and we took our 75%. The case proceeds on. The plaintiff then goes on the estate, then goes on to, from a chronology standpoint, pursue the other defendant and settles the case and hold the balance of the case for a total of $1.48 million. And at that point, it's our position that, and that was one of the confusing things on the lower court, is that that is the calculation, the total amount that you figure pro rata share of costs, and make a determination of the amount that we're going to be reimbursed back. We're entitled to, by statute, 75% minus pro rata share of costs. So this case is the work comp case, because it's a death case, is continuing on for 25 years. So that hasn't been settled. So we have an ongoing obligation now to pay workers' comp benefits weekly. So I think one of the things that was not getting across to the lower court was that we have to come up with a computation how to account for the fact that we can reduce the payment by the 25% statutory fee that the claimant's lawyer is going to take minus the pro rata share of costs. But I think, really, that issue is the dollars we're talking about, the issue of can we go back now and take our costs. I mean, to us, it's the gross amount that we should be able to figure our costs on. I don't know of any law that says you do a piecemeal each time you do a settlement. My contention is the gross amount of the total settlement, that's how you figure your costs, the pro rata share of costs, and that's how you, using the Glenn formula, and that's how you determine what you can pay going forward. And chronologically, then, we, after we got, we weren't involved in the lower court case, but after we got involved, we have the right under Illinois law to stop those weekly payments until we've recouped the full amount, because it's a $100,000 time period. Our lien was greater than the $100,000, so we weren't fully reimbursed for our lien up to date at that point. So when we're in front of the trial court, the law, we're saying to the judge, and this is where I think the $20,000, $30,000 range was maybe miscommunicated, and that is, that was just what was up to date in February of that year. In fact, we were, you know, after the briefing, we're talking about June. It's an ongoing calculation. And so our position is that the court, and in fact, what's startling about what the court did is, he didn't give any basis for his order. So you're going to hear a lot about bad acts, and I'm going to talk a little bit about bad acts, but there's never been a finding of any bad acts. There's never been a finding of anything that we did that was lower our lien. The court just simply entered an order, a simple order that says we strike the lien. We actually, in our reply brief, you know, stated that this is a 137 situation, only because this Prima rec case is right on point. This is the same thing that an attorney did in another case, went in before the court, and we weren't a party to this lawsuit. This is important to understand. We're the employer, and like so many cases, we aren't even a party. So the ongoing litigation that is proceeding, the case settles, and then they get in touch with us. And typically what happens is if they don't get a hold of us before settlement with some kind of arrangement, they certainly don't disperse the funds, and they've really lost their leverage. They have to pay us the full amount we're entitled to under the statute. So in this case, we got wind of the fact that the settlement was being dispersed, I think because of a conversation about paying back a litigation loan, and we hadn't been reimbursed yet. So that's when we filed the motion. We got on the court with the program court and said don't let them disperse these funds. We need to get our lien paid. And counsel responded with filing a motion like in the Prima rec case saying, Judge, you need to strike this lien to zero. Well, in that case, that's exactly what the attorney did in that case against Liberty Mutual. And the court came in, and the judge says, well, what basis do I have to do that? He said, oh, the law is that they can only take a third of it. And the judge says, well, okay. Strikes the lien, and he said, but we'd like to be stricter to zero because of the cost involved and the various things involved. The judge says, well, I'm going to write it down to $1,000. Well, they sent the check to Liberty Mutual. Forty-five days later, Liberty Mutual cashed in and said, wait a minute. They reopen the case, go back in front of the judge, and the judge says, aside from the court's satisfaction, he said that wasn't good faith. He says, it's a simple calculation. Whether they knew about the settlement or not, my job is to protect the employer by the lien. I have an absolute duty to protect that lien, and it's a simple calculation. They took the roughly $10,000 figure. They subtracted the cost, and the appellate had a share of costs, and the judge entered an order for that amount. And, in fact, the appellate court said this not only is black-letter law, that's when they said this is specious to even make the argument from the court that you can even reduce a lien to zero, and they ordered 137 sanctions. So our position is that's the case that's right on point. There's no Illinois case that we could find of any kind that has ever reduced a Section 5B statutory lien, ever. Now, the court below and counsel wants us to make new law here. And first, before I talk about the non-cooperative aspect, they cite two cases, and both of those are important because the briefs give the impression that they're on point where a judge reduced or wouldn't allow or struck a lien. And they're the cases, one involves the Structural Work Act, and the other case involves the Public Utility Act. Both of those cases are distinguishable from our case because the lien does not attach in those cases. It would be akin to, for instance, a loss of consortium claim. If we were talking about a loss of consortium claim and a wrongful death case or a personal injury case, and we were talking about allocating it among different causes of actions, there would be something to talk about because a consortium claim is somebody else's claim. It's not the decedent's claim. It's not the injured person's claim. And the two cases where they cite, they're both distinguishable, one because one was Structural Work Act, the other one Public Utility. The lien never attached. Those are absolutely distinguishable. So the only theory that possibly could be gleaned from the judge's rudimentary order was that somehow we didn't cooperate. And that harkens back to my little anecdote, and that is we have absolutely no obligation to cooperate. And our Supreme Court in BLAG, and it's been cited many, many times, says we don't need to side with the employee, and it's the utmost importance of the trial court to protect the employer's lien. The utmost important. And the counsel is going to get up and talk about Delaware because there's nothing in Illinois that contradicts our position, but Delaware doesn't have that. They don't have that indemnity. They don't have that absolute, that clause written into their statute that says that the judge has to do that. So that's absolutely distinguishable from our case, aside from it being a Delaware case. The lower court on these bad acts, if you think about them for a second, there was no finding that the bad acts is the reason you reduced the lien, but if you look at them, because that was argued and briefed, how did they affect this settlement? I'm very confused when you think about the four things that were alleged. We took 75% of that initial $100,000 settlement, so, man, that makes it hard for us to prosecute this claim. Well, the plaintiffs have turned to 25% of that, $25,000. That certainly is enough to get you going a little bit further, but let's assume this wasn't a workers' compensation case. Every case, PI case in the world, everybody has to front to keep the case going or may find some mechanism. So I don't see how that in any way affected the ultimate recovery in this case. The second failure to cooperate is the death benefits in an not a party to the suit, but the workers' compensation claim, the death benefit was being paid at the wrong rate for a while. And the reason for that was actually the commission put out a sheet of the minimum death rate, and it was an error, and we've discovered that. But how did that affect a PI settlement or a PI case? It's not admissible. It's not a basis for lost wages. It's not a basis for anything. It had no bearing at all on the ultimate $1.48 million settlement. The other thing is we contacted, we being the employer, contacted the injured worker or the debt-receiving spouse for a wellness check. And that happens all the time in workers' comp. And the reason, in the first, I think all of them but one were done before counsel had even filed an application and even instituted a workers' compensation case. So you have an adjuster, not a lawyer, an adjuster contacting because under the death statute, workers' comp, if the spouse remarries, we have to automatically pay two years of benefits, and it's over. If she gets divorced, if she dies, so there's things that we have to do, and we can't rely on somebody to tell us, oh, yeah, just keep sending the checks, just keep sending the checks to our office. So the wellness checks are a regular thing that happen in comp. It had nothing to do in any way with the ultimate PI case. And in fact, I would posit if there was some inaccuracy in the adjuster's typing of notes to her file, that's what our trials are about. Every single workers' compensation case you have, whether there's a lien or a subsequent case, they take a statement from the petitioner. That always comes up in the third-party case. It's not admissible. You've got to go take the deposition to the various people, and you exploit it if there's inconsistencies. That's how you operate as a trial lawyer. But there is no showing of any kind that the health and wellness check report somehow affected the $1.48 million settlement. The last thing was the providing records to the defendant but not to the plaintiff. And I can tell you the subpoena went to the adjuster, and it was an out-of-state subpoena. So the argument is, well, they didn't need to respond. It was an out-of-state subpoena. I can tell you there's lawyers that don't even know what to do when they get a subpoena out-of-state. I mean, I personally practice in Illinois. We send records to doctors in St. Louis. You know, we get the standard response. We don't need to honor that. But adjuster gets a subpoena from a lawyer saying, we need you to provide documents, and she sent the documents. There is nothing in our record where the plaintiff sent any subpoenas, sent any motions to secure evidence, motions to do site inspections, took depositions, anything to secure any evidence to require us to cooperate. And as I said in my little initial anecdote to start, we don't have any obligation to side with them. I'm not sure which way our position is, and it could change. But the bottom line is we have no reason that we have to cooperate with them. So those are the reasons of non-cooperation or bad acts. Now, I will tell you, if I thought myself that somehow a prior adjuster mucked up the settlement, there is no settlement here. Our law is you cannot consummate a settlement unless you get the signature of the employer. So if I didn't think that he maximized the settlement getting $1.48 million, I would probably stand in front of you and in front of the floor of court saying, wipe this settlement out, somebody mucked this up, and we can step into their shoes. And I've done that before. If I see somebody not prosecuting something correctly, I won't settle. And I'll step into their shoes, I'll put the proof on the right way, and I'll maximize the value of the settlement. And we have every right to do that. So I can tell you it's self-serving for me. If I thought that they had not maximized their settlement, whether it was bad acts or about their own bad lawyering, I would be telling you and telling the lower court, cut this settlement, obviate this settlement, and let's go start and get the right amount we should get. We're not doing that. The reason we're not doing that is because $1.48 million, under the facts of this case, was a great settlement. What we were doing is coming before the court and saying, and you can see all our calculations, we painstakingly tried to, in every brief we filed, try to lay out. There's even, as you know from the Glenn formula, there's a different formula in federal court, there's a different formula up in the first district. We laid all those out for the court. We tried to say, really, the only issue we have now is how to reimburse our lien going forward. And we have a little bit of a quirky situation because of the cost. Is it the gross cost of both settlements, or are we done on those costs from that initial $100? Our position is we're not. But it is, in part, it's a math formula. And we've laid all those math formulas out for the court, and that's why we were there. And the reason I bring up this poor situation of a probate court walking in, the prior judge had sat down with us and said, this is a calculation. File a brief to show us the proper calculation. So to our surprise, we're going down to get a ruling from the court as to how we're going to break this down and how it's going to go forward, and we walk away with an order that's absolutely inscrutable that says that your lien has been stricken. And he denied our request for $137. Our attorney's fees for making the argument, which is contrary to the Fremmer case. But all we ultimately want is for this case to be reversed back down to the lower court with the direction that we make the calculation as to the past benefits, and we come up with the formula going forward as to how we pay weekly. And we've laid that all out, and that is the weekly minimum death benefit minus the pro rata share of costs and the 25% attorney's fees. We have that amount calculated. It's simply an order that needs to be issued, and we will pay that money going forward until either the 25 years runs out or the spouse dies or she remarries. And so we would ask you to reverse the court, or reverse the lower court, holding that way, and to maintain the longstanding law in Illinois that the employer has an absolute statutory right to its Section 5 D lien. Thank you. Thank you, counsel. May it please the Court. My name is Brian Wendler. I'm here representing the estate. And before I get into my argument, I would like to note for the record the comments by Mr. Kelly that Judge Hartigan was not well versed in what transpired below is contrary to the record. There's a 671-page record of this case below, a 50-page transcript with Judge Hartigan. And on page 5 of that transcript, I specifically told Judge Hartigan this case is probably most likely destined for an appeal. One side or the other is going to appeal it. That's in the transcript. So Judge Hartigan, I think, did a good job, and I think he ruled correctly and should be affirmed. There's a point that's been raised with respect to Defendant's Rule 137 request that I think I want to take up first. That request below was raised for the very first time in a SOAR reply brief, and that's in the transcript, the record at page 542. The SOAR reply brief that they filed in which this 137 request was made was limited to a single paragraph based upon my suggestion that an appeal was likely. That's what they claimed the 137 request for below. This is on page 542 in the transcript of page 20 and page 45. That same SOAR reply brief was a brief that they filed in response to Judge Eder's prior request that we submit affidavits to prove up our costs because they claimed a lien without an affidavit, and we had attorney costs that we were claiming without an affidavit. So we submitted our costs via affidavit. They submitted theirs with a 12-page brief that now asks for the first time for 137 sanctions, and in that same brief they cited to a Rule 23 opinion and analyzed that for a couple of pages, which is a no-no. Ironically, in their initial brief in the trial court, and this is on page 508 of the record, they wrote, quote, MTRMA does not ask for Rule 137 sanctions. That's the brief they filed on December 7 of 2016. So they saved the request for a 137 sanction in a reply brief, which is prohibited. I bring this up because under the law, the ruling of the trial court can be affirmed by this court on any basis that appears in the record. Under the law, a party cannot request new relief in a reply brief, let alone in a SOAR reply brief. Whether Judge Hartigan denied the request on that basis or not, we don't know, but it's in the record that that's what happened and it's undisputed. This court can affirm it on any basis. Point number two, counsel claims there were four bad acts at issue in the case. I went through the record and I counted 18, and I can go through these one by one, but there was an intentional underpayment of Ms. Rexroth's weekly benefits. Then they unilaterally, without authority, reduced her benefits by 75%. Then they, two weeks later, unilaterally stopped all benefits, which they can't do under the statute. They had the ex parte communications with my client. The employer's counsel below threatened my office with disciplinary charges if we attempted to contact any of the employer's non-control group employees and then wouldn't tell us who the control group employees were. They refused us access to the truck and the records, the maintenance records for the truck. They supplied records to the defendant and it was not limited to the wellness checks. I can give you all record citations if you need these for any of them. They created incorrect wellness check reports. In this case, the Rexroth estate, while the underlying case is pending, they took out one of these, I call it God-forsaken lawsuit loans that charge exorbitant rates to finance a lawsuit. Mrs. Rexroth needed the money for the children. When the intervener's attorneys found out about this and found out that the interest was accruing at $250 per day on that loan, that's when they started this stuff about we will agree to this if you agree to these terms and that's when they wanted to add $11,000 on to the lien that they wanted to claim. They miscalculated the lien by $11,000. They led us to believe there would be a settlement where the employer would pay $150,000 to settle the case and this continued discussions on that after they found out about this lawsuit loan. When the first settlement came in, when the owner asked about that $100,000 settlement, we specifically asked them to hold off on trying to get their lien recouped on that one until the entire case is over because you have to know what the total costs are in order to assess the lien. They said no, we want our lien now and that's what we're entitled to. So they left us with zero. They got that. We got a court order that allowed that. They got their money. They drained the pond and left zero for the prosecution of the case. Then when we settled the remainder of the case a year or so later, I'm not allowed to say the number, the number that he gave you when they got that settlement, then they wanted to go back and redo the settlement from the first $100,000 because on the first $100,000 they got 75% of the money and therefore they were responsible for 75% of the costs. Then when the bigger number came in, their percentage of the money was substantially less and therefore they were entitled to claim a lesser number on the cost and they wanted $11,000 back. We decided to amend the whole doctrine where you can't do that, but they did it and that's what they were demanding. This issue about distributing money that we got from the settlement, the record's clear. We held every penny to the maximum amount they were claiming. We held it in an escrow account. But time and time again we were told, and the court was told, that we distributed the funds. Well, we did distribute some of the funds, but not all of them. We saved the exact maximum amount that they could ever possibly claim by their own inflated numbers. That money is still sitting in my escrow account. There's never been a depletion of that money. Counsel, would you address the Free Interact case and tell me why it doesn't apply? I would be glad to. One, the Free Interact case, I'm very familiar with the attorney in that case, Ms. Susan Rawlins. I've had issues with her myself. But in that case, the court said and made it clear that it was improper because the plaintiff's counsel in that case did not get service, did not acquire service over, I think it was Liberty Mutual, the insurance carrier. And the court said that doesn't meet the minimum requirements of due process. So she sent a letter to, I think it was Liberty Mutual, indicating that they were going to file a motion, and Liberty Mutual either didn't have time or desire to show up at the hearing, but there was never a subpoena, I'm sorry, never a summons or an attempt to join Liberty Mutual into the case. Our case is just the opposite. We brought this matter to the forefront in the Effingham probate court because they never joined into the Indiana case like they could have and as the statute requires. So we brought it to the forefront of the court in Effingham. They voluntarily entered. We didn't have to serve them an appearance with a summons. They voluntarily submitted to the jurisdiction at the court there. So there is no due process violation, and I think that was the gist of the Fremont case. Look at the statute in 5B and tell me what part of that statute is not an absolute right to leave. Well, the part of the statute that is an issue is the section that starts with if the injured employee or his personal representative agrees to receive compensation. The next paragraph says, let's see, in such actions brought by the employee or his personal representative, he shall forthwith notify his employer by personal service or registered mail of such fact and of the name of the court in which the suit is brought, etc. And then it goes on to say the employer may at any time thereafter join in the action so that all orders of court after hearing of judgment shall be made for his protection. The statute they're dealing with obligated the intervener in this case to join into the Indiana, Indianapolis court where the underlying case was filed. That's what it says. It says join in the action. After we supply the name of the court, they did not join in that case. They could have and they should have. Mr. Are you suggesting that joining in the case was a prerequisite for them having a lien? I'm suggesting that the whole argument about the court was obligated to protect their interests is based upon that paragraph of the statute. And that paragraph of the statute talks about joining in the underlying action in that court, not in the Effingham probate court. And the statute does say above that under section B that there shall be paid to the employer the amount of compensation paid or to be paid to such employee or personal representative. But the statute doesn't say that it's unconditional no matter how egregious or how bad the lien holder behaves in the underlying case. So you do have relief under the compact, don't you? Under the compact in what respect? For egregious behavior on the part of the lien holder. Not for what happens in the civil lawsuit, no. I'm aware of. If there's an underpayment, yes, you can go to the work comp commission for that. But I'm not aware of anything that allows us to get relief under the work compact for obstruction of a lawsuit. Does that answer your question? The compact that allows for pen fees and attorney fees for improper conduct. I'm not aware of anything under the compact that allows for what happens in the civil lawsuit to become part of your, I guess the 19B you're talking about, action in the comp claim. But I'm not a work comp specialist. I don't profess to be. Let's see. Back to the list. There were 18 points that I wanted to bring up of the bad acts. It wasn't limited to the four that counsel suggested. Let's see. My next point was that I was going to point out that they never intervened in the Indianapolis case. And I cite the statute on that. They knew about the Indianapolis case because they appeared for a mediation in that case. It was his predecessor, not his firm. But they never, under that same statute they're relying on, under the same work compact, never paid the full compensation until long after Judge Hardigan ruled. And they failed to follow the rules for ceasing or reducing payment, which they did. So they're trying to cherry-pick parts of the statute they want to enforce but not comply with all of it. And I guess back to your question, can we have gone to the work comp system to get relief on that? Some of these we could and some not. The statute is silent on whether or not obstruction and lack of cooperation warrants a denial of a work comp lien. And that's why we went to the... Well, can't some of the conduct that you allege that was wrong have been remedied under the civil litigation, such as discovery abuses, things of that nature? Well, this was not considered. The discovery abuses would have been asking an Indiana court to sanction an Illinois company that's not a party to a lawsuit, and I don't think that would even be possible. They weren't before the court. That kind of gets back to what happened in Freemont. They weren't before the court. And there was no subpoena that we served that would have justified that anyway. And that kind of dovetails into another argument they made, that we didn't serve any subpoenas. Yes, that is true. We intentionally did not serve any subpoenas because we didn't want to gather up information and evidence in the Indiana case that could be used against us. There's a looming issue in the Indiana case as to why Mr. Rexrow's truck was broke down in the first place. And this is all detailed in my e-mails to counsel and representing the employer in the underlying case. The truck was broke down alongside the road. The defendant's testimony was that the truck did not have its emergency flashers on. We were trying to get information about why that truck had broken down and getting the maintenance records for that truck to prove that that was wrong because everybody else said it was wrong. We got zero cooperation. I didn't want to get the records if it was going to help the defense in the case, and that's why we sent these informal requests, very much like the defendant sent informal requests in the underlying case. And we got nothing. So I don't think I have anything else to add. I will rest on our brief for the remainder of this. But I would ask the court, if there's one other thing I do want to add. Back to the 137 issue, this is not the first time that I've been involved in a case where a judge struck a work complaint for lack of cooperation. I reported that to Judge Partigan below, and I've actually been in court and witnessed another attorney, a man named Bob Boslett from Tennessee. That's, in fact, Mr. Boslett's argument with Judge Matojan where I learned of this Delaware Supreme Court opinion. I saw him argue a case in front of Judge Matojan. The lien was stricken in. That case actually went up on appeal. Bob told me that they settled the case before ruling by this court. But this is the third time, at least, that I'm aware of where liens have been stricken. So the argument is made that this can't happen. It's just not true. I would ask that Judge Hartigan be affirmed in all respects, and thank you for your time. Thank you, counsel. Thank you. Justices, I would just ask the way that that argument ended, that that not be considered anecdotal evidence about three times it being stricken in the past. We have begged counsel to come forward with any law that would support those anecdotes, and he's never done that, and I've found none, and there is none in Illinois. I want to try to answer some of the questions that you had. With regard to the we're comp statute, yes, absolutely. There is a mechanism to have a hearing noticed up and heard within 15 days, and counsel could have done that at any time if he thought the rate was wrong. I'm sure if you pulled somebody out of the stands that did comp, Mr. Unsell or somebody, they could have that done in no time. So absolutely could clear up everything with regard to that were comp discrepancies. With regard to the civil lawsuit, the same thing. Creative lawyers find ways to do site inspections. They find ways to communicate. So how would the Indiana court get jurisdiction, as counsel indicated? Well, I guess I'm confused, and I wrote down the bad acts, the 18 bad acts, and I categorized them into 14 things, I mean into four categories. He said 18 had stopped at about five, and I can talk about all of those, but what is the bad act? I mean, that's what I'm trying to figure out. What is it that was compromising his case over there that he would have asked the court to intervene? He's already told you, and I think it's really revealing the reason he didn't do it, and that is trial lawyers, we have to make calls. Do I want to send a subpoena? If I do, I might get bad information. So I didn't do it. If he sent a subpoena to our employees, to our employer, to ask for records and they didn't do it, first of all, he'd have to do it correctly. He'd have to get jurisdiction here and get that subpoena issued by a court of our jurisdiction. If he did it properly and then they didn't comply, he most definitely would have to get a court to be able to exercise jurisdiction over that subpoena. If it was records, if it was employees, if it was preserving evidence, if he did it the right way, he certainly could do that, and he would get it before a court, whether it was the issuing court of the subpoena or the home court, and he could most definitely do that. And he said why he didn't. He had to make strategic calls as a lawyer, and he elected not to do that. He said he didn't do the work comp side because he doesn't really quite honestly know much about work comp, and that matters because we're not going to graciously do things at the detriment to our client to help people with their cases. As I said at the beginning, we have to protect our client's interests, and that is the lien. So to answer those questions, you also asked what is it in the statute that would allow him to do this, have the court do this without the employers being involved, and it's funny because I highlighted every part of that except for what he read. He didn't read the salient part. It says, first of all, the part he did read, he stopped right before it said, the employer may at any time join in the action. If we wanted to, to go over to petition, intervene over in that court, we may do that. We don't have to do that. Why would we want to do that if our client is sitting there thinking, okay, this is a $1.5 million case. He's going to collect that. Why would we want to spend a bunch of money going over there and filing pleadings in that case? He did a pro hoc de chain motion. Do you think my client wants to pay or find local counsel over there? No. They sit back, and like he said, come to the things you need to come to. Protect your interests. Go to a mediation. And that was what was done. And I wasn't the attorney, but I can tell you there was nothing contrary to how this operates that he indicated that influenced his case at all. So we may enter into the case. He represented we had to, and that was really a big deal, and it's not. Then what he didn't read to you is, and this is the part that I highlighted, no release or settlement of claim for damages by reason of such entry or death, and no satisfaction of judgment in such proceedings shall be valid without the written consent of both the employer and employee or his personal representative. So this is the language that's not in the Delaware. And then it goes on. The consent is not required where the employer has been fully identified or protected by the court. That's not in the Delaware statute, but that's the strong language. It's an absolute, and that was not read to you. The issue about the Fremark case, Fremark or whatever, how do you pronounce it? I mean, I can't tell you what a red herring that issue is about service. Yeah, that happened. But there was a full hearing given to Liberty Mutual, and the judge, when a person stood up and said, not strike it all the way, he said strike it by two-thirds. This is what the court, when they got notice on the defendant and brought him in and brought Liberty Mutual in, we know that counsel's rather specious request to extinguish the lien in a statement that a workers' compensation lien could not exceed one-third of the settlement was not supported by statutory or case law. And then the court went on to award sanctions. We would ask that the lower court be reversed and an order entered outlining how the lien should be reimbursed, and payment's going forward. Thank you. Thank you, counsel, for your arguments. The court will take this matter under advisement and render a decision in due course.